ALLISON HILL TRUST COMPANY, Plaintiff, v. THOMAS SARANDREA, Defendant.

Supreme Court, Madison County, July 26, 1929.

*John L. Robertson,* for the plaintiff.

*Barwell & Fazio* [*R. D. Woolsey* of counsel], for the defendant.

SENN, J. This is an action on a draft or trade acceptance of seventy-two dollars dated March 2, 1926, discounted by the plaintiff, a banking corporation, before maturity, and alleged to be held by it in due course. It was drawn on the defendant, who accepted it, by the Walter S. Schell Co., Inc., a foreign stock corporation, hereafter, for brevity, called the Schell Co., and was for the purchase price of an onion setter sold by the drawer to the drawee. The setter was sold to the defendant through one Patsy Ausilio, as agent of the Schell Co., and who sold its goods, consisting of onion setters and screens, seeds and onion sets, in the onion growing district in and about Canastota, N. Y. The goods were shipped from out of the State and delivered at Canastota, where the order for the onion setter in question and the trade acceptance were signed. The trade acceptance was made and payable within this State.

The answer alleged that at the time when the transactions took place the Schell Co. was doing business in this State without having first procured the certificate required by section 15 of the General Corporation Law (as added by Laws of 1927, chap. 425), and that, therefore, this action cannot be maintained by the plaintiff claiming under said corporation. It is conceded that the certificate had not been obtained and the only issue of fact is whether the Schell Co. was doing business in this State within the meaning of that section.

There was evidence to the effect that Ausilio was the Schell Co.'s agent in and about Canastota; that he sold goods as orders were received by him, he sending the orders to his principal where, if accepted, they were filled and sent to Ausilio for delivery to the purchasers. He paid the freight and the Schell Co. paid him. The onion setters and screens were kept in his father's barn. Some of them were left over and at the time of the trial (May, 1928) had not been delivered and were still at the barn. On at least one occasion he sold one of them to a party who had not ordered it (Mr. Sgroi). The machines were set up by him after being received. He hired help in setting them up and once purchased material needed in setting them up, for which the Schell Co. repaid him.

The onion seeds and onion sets were sent to Ausilio in carload lots and delivered by him from the car. There were nine or ten such carloads with 700 or 800 bushels to a carload. While he claimed that he only received such seeds and sets as were ordered by customers, it does not appear that they were in separate parcels or segregated according to the respective orders, except that the seeds other than onion seeds were sent direct to the purchasers. Sometimes consignees wanted more than they had ordered and were furnished as much additional as they desired from the car. For instance, Carl Torredor had given his written order for 200 bushels of onion sets, but when they came he wanted 50 bushels more and they were sold to him by Ausilio out of the same car at twenty-five cents advance in price over those ordered. James Goiffre had ordered 60 bushels and was sold 50 bushels additional from the car. Antonio Lenardi had ordered 100 bushels and was sold 125 bushels additional from the car. Dominick Ausilio, father of Patsy Ausilio, also appears to have purchased of his son onion sets additional to those for which he had given written orders. Evidently the Schell Co. sent enough onion sets in these carloads to not only fill the orders given, but enough additional to supply those who wanted more.

At the close of the evidence plaintiff's counsel asked for a directed verdict for the plaintiff. This was denied and the case sent to the jury on the single question of whether the Schell Co. had been doing business in the State within the meaning of the prohibitive statute.

It is well settled that the statute in question is not to be taken literally. A foreign corporation may transact some kinds of business within the State without procuring a certificate or submitting to control. If its business be interstate, it is beyond State interference. To come within this section, the foreign corporation must do more

than make a single contract, engage in an isolated piece of business or an occasional undertaking; it must maintain and carry on business with some continuity of act and purpose, that is, a corporate continuity of conduct, such as might be evidenced by the investment of capital here, with the maintenance of an office for the transaction of its business and those incidental circumstances which attest the corporate intent to avail itself of the privilege to carry on a business. In short, it should appear that it intended to establish a continuous business in the State and not one of a temporary character. (*Penn Collieries Co.* v. *McKeever*, 183 N. Y. 98, 103; *International Fuel & Iron Corp.* v. *Donner Steel Co.*, 242 id. 224.)

A single act cannot constitute doing business. (*New York Architectural Terra-Cotta Co.* v. *Williams*, 102 App. Div. 1.) Neither would two sales. The statute is a rigorous measure and should receive a reasonable interpretation. (*Ozark Cooperage Co.* v. *Quaker City Co.*, 112 App. Div. 62.) There must be more than an occasional transaction. (*Brown Seed Co.* v. *Richardson*, 53 Misc. 517.) Having a selling agent in the State who is paid a monthly commission and who at his own cost maintains an office with the corporation's name on the door, is not doing business within the meaning of the statute. (*Schwarz* v. *Sargent*, 197 N. Y. Supp. 216.)

Sales by a commission agent of a foreign corporation, partly on commission where the orders had to be approved by his principal and partly from stock consigned to him by it for the benefit of purchasers who desired a speedy delivery, no approval of such sales being necessary, the principal having otherwise no capital invested in the State, was held not to be doing business in the State within the meaning of the statute in question; that the agent and not the plaintiff was doing the business. (*Lederwerke* v. *Capitelli*, 92 Misc. 260.)

Consignments to commission merchants are not within the statute. (*Brookford Mills* v. *Baldwin*, 154 App. Div. 553.)

A foreign corporation is not doing business in the State when it has no place of business, no office and no stock of goods in the State, which simply consigns goods to merchants for sale under contracts subject to the approval of the vendor corporation. (*Chase-Hackley Piano Co.* v. *Griffen*, 149 N. Y. Supp. 998.)

From the foregoing and many other authorities of the same general tenor it will be seen that under the most favorable view of the evidence for the defendant, it is doubtful, to say the least, whether the Schell Co. was engaged in business in this State within the meaning of section 15 of the General Corporation Law (as added

by Laws of 1927, chap. 425),* but for the present and in view of the fact that several similar cases are said to be pending, I will assume that it was.

On this assumption we have the question of whether this defense is available as against the plaintiff bank, a holder in due course, because under section 15 of the General Corporation Law the Schell Co. and all persons claiming under it would be prohibited from maintaining an action on the trade acceptance in question, while under section 96 of the Negotiable Instruments Law the plaintiff holds it free from any defense which might be available to the defendant as against the Schell Co.

Reading the two sections together there is an apparent conflict of laws. The question is, do the words " all persons claiming under * * * such corporation " include a holder in due course.

I have been unable to find any authoritative case directly and comprehensively in point.

In *Halsey* v. *Jewett Dramatic Co.* (190 N. Y. 231, 235) there is a dictum to the effect that such a defense would not be good as to negotiable paper taken in good faith from the corporation before maturity, but that was a case under section 181 of the Tax Law which prohibited a foreign corporation doing business in the State which had not paid the tax therein provided. The denial of the right to maintain an action did not in words apply to any one except the corporation itself. The court held that it did apply to its assigns who could be in no better position than the assignor, but would not apply to a holder in due course. The case is not directly in point, but it shows the trend of judicial thought in that regard.

*Manufacturers' Commercial Co.* v. *Blitz* (131 App. Div. 17) contains an intimation that a holder in due course would hold free from any defense under section 15 of the General Corporation Law, but the opinion was obiter, the question not being squarely before the court. While it probably is not an authority on the question, it likewise emphasizes the disposition of the courts to sustain paper held in due course.

" The general and well-settled rule in favor of negotiable paper is that an innocent purchaser for value, before maturity, is unaffected by the fact that the consideration was illegal, and the note void and unenforceable by one having notice of the facts. If the illegality of the consideration results from a statute merely prohibiting a business * * * but does not declare a note or bill based upon such a prohibited transaction absolutely null and void, a *bona fide* holder of such paper will be protected." (*Lauter* v. *Jarvis Conklin Mortgage Trust Co.*, 85 Fed. 894, 895.) This case

---

* Now Gen. Corp. Law, § 210 (Laws of 1929, chap. 650).

was under a Tennessee statute which did not expressly or impliedly declare a note made in the course of such a business void in the hands of an innocent holder for value. It merely prohibited the offending corporation from maintaining the action.

" With the exception of those cases in which the statute has declared notes void, it may be laid down as a broad general principle, that whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it." (*Vallett* v. *Parker*, 6 Wend. 613, 619.)

" It is all important to the commercial world, that courts do not go in advance of the legislature in rendering negotiable paper void in the hands of an innocent indorsee. Wherever the statutes declare notes void, they are and must be so in the hands of every holder." (Id.)

. In *National Bank of Commerce* v. *Pick* (13 N. D. 74; cited in 8 C. J. 772) it was held that if a negotiable note is given to a foreign corporation in a transaction which is illegal because of the corporation's failure to comply with the conditions precedent to the right to do business prescribed by statute, the illegality cannot be set up as against a *bona fide* purchaser for value, and the words " or its assigns " do not include the holder in due course. However, the North Dakota statute did not include " all persons claiming under such corporation."

In *Williams* v. *Cheney* (3 Gray [Mass.], 215) it was held that a note for a premium of insurance given to a foreign insurance company which had not complied with a statute necessary to its right to do business in the State (Massachusetts) was void in their hands but valid in the hands of a holder in due course, even though the company had canceled the policy.

In *State Bank of Chicago* v. *Holland* (103 Tex. 266, 270) the court, quoting from 1 Daniels on Negotiable Instruments (¶ 197), said: " There is, however, one exception to this rule,— that, when a statute expressly, or by necessary implication, declares the instrument absolutely void, it gathers no vitality by its circulation in respect to the parties executing it, though even upon such instruments an indorser may be liable."

In *McMann* v. *Walker* (31 Colo. 261) it was said " the plaintiffs were in no manner connected with the original transaction and they violated no law in purchasing the note from the payee."

In *Katz* v. *Herrick* (12 Ida. 1) the court said: " ' By the weight of authority, if a negotiable note or bond is given to a foreign corporation in a transaction which is illegal because of the corporation's failure to comply with the conditions precedent to the right to do business prescribed by statute, the illegality of the note may be

set up as against a holder of the note who has not paid value, or who purchased with notice, but not as against a *bona fide* purchaser for value without notice.' "

A contrary doctrine was held in *First National Bank of Massilon v. Coughron* (52 S. W. [Tenn.] 1112) by the Court of Chancery Appeals in 1899, where a note was given to an Illinois corporation in part payment of a separator, the title to which was in the vendor until the note should be paid, where the corporation had not complied with the statutes of Tennessee which prescribed the terms on which it could do business in the State, it was held that the note was void in the hands of an innocent purchaser for value. The last case only shows that the decisions have not all been in harmony, even in the State of Tennessee. (See *Edwards v. Hambly*, 133 Tenn. 142; 180 S. W. 163.)

The history of the law exempting holders in due course of negotiable paper from defenses otherwise available, is important. It was quite succinctly set forth by ANDREWS, Ch. J., in *Knox v. Eden Musee Co.* (148 N. Y. 453) as follows: " The rigid rule of the common law, which prohibited the assignment of choses in action was, in England, at an early day, relaxed to some extent to conform to the usages of merchants and the necessities of commerce, and at length, by the aid of statutes and judicial decisions, bills of exchange and promissory notes were completely taken out of its influence and they came to have distinct attributes and qualities not pertaining to any other form of contract. They were not only made transferable by delivery and suable in the name of the transferee, but, contrary to the general rule of the common law, honest acquisition for value was held to give to the transferee a new and original title, wholly independent of that of the prior holder and subject to no infirmity which affected the paper in his hands. The real owner who had been despoiled of the paper by robbery or theft, or who had lost it without negligence, was concluded from re-claiming it and the maker, although he had been defrauded into executing it, could not be heard to allege the fraud as a defense against a *bona fide* holder. And the transferee, although he may have been negligent in taking it, nevertheless, unless he acted *mala fide*, his title, according to the doctrine now settled, will prevail. These familiar but arbitrary principles applicable to commercial paper, originating in commercial policy, the encouragement of trade, the convenience of having some representative of money readily convertible and commanding confidence, while they operate in many cases with great severity upon the rights of innocent persons, have contributed greatly to stimulate commerce and advance the prosperity of states."

The doctrine contained in the above quotation has been reiterated in many subsequent decisions and the tendency has been to strengthen it rather than otherwise. It has become almost a religion of commerce and of commercial law, if such a figure of speech may be permitted.

In view of these rigid provisions and interpretations and the reasons upon which they are founded, I hesitate to believe that the Legislature ever intended to include holders in due course when they used the words: "This prohibition shall also apply to any successor in title of such foreign corporation and to any person claiming under * * * such foreign corporation." (Gen. Corp. Law, § 16-g, as added by Laws of 1927, chap. 425.)

It may be asked to whom did they refer and what did they mean, if not holders in due course. The answer is, that there are other possible holders than payees, assignees and indorsees in due course; for instance, receivers, indorsees with notice and others coming lawfully into the ownership of such paper.

There is a question, too, as to whether a holder in due course claims under the original holder of the paper. According to the opinion in *Knox* v. *Eden Musee* (*supra*) the honest acquisition for value gives to " *the transferee a new and original title, wholly independent of that of the prior holder.*"

If this is correct doctrine, and although obiter I believe it is, then the plaintiff does not hold the note in question as claiming under the Schell Co. but by a new and original title of its own.

In another view, it may be said that it holds it claiming under the defendant maker himself. Under section 110 of the Negotiable Instruments Law the maker of a negotiable instrument, by making it, engages that he will pay it according to its tenor; and admits the existence of the payee and his then capacity to indorse.

This section, according to the doctrine of estoppel, would seem to preclude the defendant herein from interposing his defense as against the plaintiff. Having admitted the capacity of the Schell Co. to indorse and thus induced the plaintiff to part with value for it, how can he be heard to say that by reason of the failure of the Schell Co. to comply with a statute, the plaintiff could not become a holder of the paper in due course? (*Edwards* v. *Hambly Fruit Co.*, 180 S. W. [Tenn.] 163.)

What would be the effect of such a holding? It would be that every bank discounting such paper of a corporation would be put on its inquiry as to whether that corporation was doing business in the State where the instrument was given or the contract on which it is based was made, within the meaning of such a law, and if so

whether it had complied with the laws of that State in regard to the transaction of such business. In a case like the instant one they would have to decide at their peril a close question of law and fact or refuse to discount all paper of that kind. It could not have been the legislative intent to produce a result so at variance with the requirements of business and the policy of the law.

I must, therefore, hold that whether or not the Schell Co. was doing business in this State within the meaning of the statute in question, that fact is not available as a defense in this action.

The motion to set aside the verdict of the jury and for a new trial must be granted, with costs to abide the event.